

**SO ORDERED.**

**SIGNED this 29 day of October, 2009.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: | |
| MICHAEL R DIPMAN, | Case No. 09-10620 |
| MARLA J DIPMAN, | Chapter 13 |
| Debtors. | |

## MEMORANDUM OPINION

This case came before the Court for an evidentiary hearing on October 13, 2009 for confirmation of debtors' amended chapter 13 plan. The trustee and several creditors object to confirmation. The debtors appeared in person and by their attorney Susan Saidian. Laurie B. Williams, the chapter 13 trustee, appeared in person. Creditor Meritrust Credit Union appeared by its attorney Eric Bruce. Creditor ABC Supply Co. appeared by its attorney Thomas J. Lasater. Arst & Arst appeared by Alissa Arst.

-1-

Because the Court today denies confirmation of debtors' amended plan, it does not reach the other pending matters before it: Meritrust Credit Union's objection to debtor's claim of exemption, motion for relief from the stay, and motion to dismiss for failure to make plan payments and Arst & Arst's (debtors' former bankruptcy counsel) application for compensation.[1] Prior to the commencement of the trial, the Court granted creditors Michael and Bev Metz's (former roofing customers of debtor) request for the Court to set a proof of claim deadline and permit them to file a proof of claim herein.[2]

Findings of Fact

Michael and Marla Dipman filed this case on March 13, 2009 and their chapter 13 plan on March 30. They filed an amended plan on August 13, 2009.[3] In that plan, they proposed to pay 54 monthly payments of $3,493 per month, or approximately $188,000. Their original plan proposed payments of $1,551 per month for a 36 month period. Since this case was filed, debtors have made one scheduled plan payment of $1,551 in April of 2009. Mr. Dipman has made a series of partial payments, including an $800 payment that was returned for insufficient funds, but no full payments of either plan payment amount. The trustee has also received about $4,700 in collected accounts receivable from Dipman's roof business, but the ownership of these funds is highly disputed.

Mr. Dipman is a roofer presently employed in some capacity by Roof Mechanics. He started this employment in late July of this year. He is paid $1,000 a week, in cash, while "laying low" due to adverse publicity arising out of his post-petition conduct in taking roofing deposits from

---

[1] Dkt. 25, 28, 70 and 39.

[2] *See* Dkt. 120. The Metz creditors were added to schedules after the original proof of claim deadline.

[3] Dkt. 100.

individuals and failing to perform the contracts. Mrs. Dipman works for IMA as a workers' compensation claims adjuster. She is paid about $4,200 per month gross and about $3,100 net. At present, their plan provides for payments of $3,493 per month retroactive to the date of petition and they are significantly in default of payments, even if this Court were to confirm the amended plan today. Mrs. Dipman says she will not consent to an employer payment order being entered at IMA because she fears this will imperil her employment. She pays the household expenses from her salary. They have three minor children. Debtors contemplate that Mr. Dipman will make the plan payments from his income.

According to their amended Schedules I and J, the Dipmans will have about $3,600 in disposable income per month.[4] Form 22C, debtors statement of current monthly income and calculation of disposable income, shows that debtors are above-median income debtors, subject to an applicable commitment period of 5 years and having monthly disposable income of <$343>.[5] However, Dipman's employment is questionable. He has been in the roofing industry for 16 years. For about 5 years, he worked for Roof Mechanics as a roofing foreman and salesman. He left in June of 2006 to start his own roofing enterprise named variously Derby Roofing & Sheet Metal and, later, Derby Roofing LLC. He established the LLC in August of 2007, but, according to his testimony, continued to do business as a sole proprietor. He borrowed some $40,000 from Meritrust as an LLC and gave them his personal guaranty as well as a security interest in the LLC's

---

[4] Debtors' Ex. 1. It does not appear that these amended Schedules I and J, signed by debtors just days prior to trial, have been filed with the Court. In any event, they reflect Mr. Dipman's current employment by Roof Mechanics. The original Schedule I and J filed March 30, 2009 shows Mr. Dipman self-employed in his roofing business with disposable income of $1,551. *See* Dkt. 20.

[5] Dkt. 18, line 59.

receivables. He now says the LLC had no receivables and that all the work he did was done as a sole proprietorship. He says he formed the LLC merely to lay claim to the trade name "Derby Roofing." He filed a notice of dissolution for the LLC sometime after this case was filed. During the pendency of this case, Dipman went back to work for Roof Mechanics in late July of 2009. He could not state how much money he made in July or August and admits he did not work for them during September. Debtor represents that he is now back employed by Roof Mechanics as of October and going forward. Debtor conceded that at no time during his "employment" with Roof Mechanics had he earned $4,333 for a month period as represented on amended Schedule I.

After the case was filed, Dipman also began operating as Tri-Cities Roofing. He gave no understandable explanation as to how one could distinguish Tri-Cities jobs from Derby Roofing & Sheet Metal jobs from LLC jobs. He appears to have used these business personas interchangeably and without any real logic or reason. After Meritrust froze his accounts post-petition, he opened new ones for the LLC, himself, and Tri-Cities at Intrust Bank.

After a significant hailstorm in Haysville in March of 2008, Dipman solicited a number of repair jobs and received funds or deposits from various customers. He did not perform or complete the roof jobs and retained these customers' funds. Dipman also took a series of deposits from various customers post-petition and failed to deliver services to them. These pre- and post-petition customer claims total approximately $27,000. He then concluded that he could no longer sustain his business and sought to be employed again as a salesman.

Shortly after being hired by Roof Mechanics, a local TV station ran a series of stories in early August about his unfortunate customers that resulted in considerable negative publicity for Dipman. Thereupon, according to Dipman, his employer told him to "lay low" and he became

-4-

unemployed after August 14, 2009. Recently, Roof Mechanics has associated with him more or less on a cash basis. When the Court issued an employer payment order in this case, Roof Mechanics advised the trustee that Dipman was not their employee.[6] According to Dipman, Roof Mechanics is concerned about negative publicity from associating with him. Dipman maintains that he is paid $1,000 per week and that Roof Mechanics withholds no taxes from his pay. Dipman has made no quarterly tax payments to date.

Dipmans' amended plan provides for payment of their house payment of about $1,100, plus other secured creditor payments through the plan.[7] Because of post-petition defaults and the considerable default on plan payments, a large home mortgage arrearage has developed, amounting to over $5,800. As the Trustee testified, disputes about who is entitled to certain collections of accounts receivable and whether they are property of the LLC or of Dipman personally, make it impossible to determine what Dipman has to pay and the extent of his deficiency under the plan as amended. The accounts receivable proceeds may either be his, in which case they may be subject to a prior garnishment lien of creditor ABC Supply, or they may be the LLC's in which case they are subject to Meritrust's security interest and not property of the estate at all.

These proceeds are payments on the Brittany Center account for roofing bills incurred in 2008. Some of the work was proposed by Dipman on LLC letterhead, and others on Derby Roofing & Sheet Metal stationery. Invoices were billed to Brittany under the name of Derby Roofing & Sheet Metal. Brittany received a Form W-9 for the LLC in 2008 and paid the invoices to the LLC at Dipman's attorney's instructions. Dipman now claims the collections were for work done by

---

[6] Dkt. 107.

[7] Under their original plan, debtors were to pay their mortgage outside the plan.

-5-

Derby Roofing & Sheet Metal. The Court notes that Dipman has a General Equivalency Diploma, but does not appear to be well-versed in business entities.

According to the trustee, if Dipman cannot generate at least $4,333 a month in income, he cannot service the scheduled plan payment. Nothing in this record supports a finding that he has made or can make that much money on a monthly basis. Mrs. Dipman's income appears to be secure, but she is not inclined to expose her pay to an employer pay order.

Conclusions of Law

*Feasibility*

To satisfy the feasibility requirement for confirmation of a plan, debtors must show that they are "able to make all payments under the plan and to comply with the plan."[8] Because debtors have above-median income, they must devote their projected disposable income to be received during the 60-month applicable commitment period to the payment of unsecured creditors.[9] Here, however, Form 22C yields a negative number.[10] The Tenth Circuit in *Lanning* permits departure from Form 22C upon a showing of substantial change in circumstances.[11] Although not raised by the parties

---

[8] § 1325(a)(6).

[9] *See* § 1325(b)(1)(B).

[10] This is problematic for debtors because if they pay nothing to the unsecured creditors, they cannot formulate a feasible plan meeting the requirements for confirmation. *See In re Lanning,* 545 F.3d 1269, 1273-74 (10th Cir. 2008), *petition for cert. filed* (No. 08-998), 77 U.S.L.W. 3449 (Feb. 03, 2009).

[11] *Id.* at 1282. *Lanning* dealt with an adjustment to the income side of the projected disposable income calculation where an above-median income debtor's monthly income (the prepetition 6 month historical figure on Form 22C) dropped markedly after filing. While the Tenth Circuit held that it was permissible to look to Schedule I to determine monthly income at the time of confirmation upon the requisite showing of change in circumstances, it did not expressly authorize above-median income debtors to deviate from the Form 22C expense deductions on line 57. Bankruptcy courts in this District have applied the *Lanning* forward-

-6-

here, the Court seriously questions the sufficiency of debtor's showing of a substantial change in circumstances to deviate from Form 22C and to rely exclusively on amended Schedules I and J for their disposable income calculation. Here, whether the Court considers projected disposable income as calculated by Form 22C or by Schedules I and J, the Court reaches the same conclusion – debtors' disposable income is insufficient to make their amended plan feasible. The Court views the feasibility issue on two fronts: the apparent lack of sufficient income to make the plan payments and the sporadic and speculative nature of debtor's current employment prospects.

The trustee argues that the best evidence of feasibility is debtors' plan payment history since filing their petition in March of 2009. In this regard, debtors' initial plan called for monthly payments of $1,551 for 36 months. At this time, debtor was attempting to salvage his roofing business in some form, either as a sole proprietorship or as an LLC. Debtor made only one full payment under this plan with his own funds (April 14, 2009). Some $4,700 was contributed by attorneys relating to the Brittany Center receivable and those funds are in dispute. Debtor made no further payments until August 18. Debtor testified that he received a check 8/14/08 from his employer, Roof Mechanics in the amount of $2,500. Of this amount, only $500 went toward his plan payments. Thus, debtor personally paid just over $2,000 in the 5 months after his original plan was filed, when the plan called for $7,755 over that same period. The Court received no credible evidence of debtor's income during this 5 month period.

Debtor filed his amended plan in mid-August, determining to abandon his own roofing business and become an employee. He obtained a job with Roof Mechanics on July 25, 2009.

---

looking approach to the expense side of the disposable income calculation and permitted consideration of Schedule J expenses. *See In re Melvin*, 411 B.R. 715 (Bankr. D. Kan. 2008).

According to debtor, he was paid $1,000 per week salary (not commission) as a roofing salesman. Under the amended plan, the plan before this Court, debtors propose to pay $3,493 for 54 months. The plan payment is to be made by a wage withholding order directed to his employer. But when the media reported debtor's bankruptcy, debtor testified that the bad press made his employer uneasy and the employer asked debtor to "lay low" for awhile. Debtor testified that he was paid in cash by his employer for part of this period but the record is unclear how often and what amounts debtor received from his employer in cash. Debtor only produced one paystub evidencing his job with Roof Mechanics, the $2,500 check in mid-August. The pay detail on this check stub shows $1,000 was payable for "commissions," and $1,500 was payable for "bankruptcy." It thus appears that Roof Mechanics advanced a plan payment to debtor, but debtor did not direct all of those funds to his bankruptcy. Moreover, when the wage withholding order was issued to Roof Mechanics, it notified the trustee in writing that debtor was no longer employed with Roof Mechanics. No representative of Roof Mechanics testified at the confirmation hearing to substantiate debtor's testimony concerning his resumed employment or the terms thereof. In any event, debtor assures the court that he now has resumed his employment with Roof Mechanics and expects to earn $1,000 per week going forward. Even if the plan were confirmed, the Court doubts debtor would keep his job with Roof Mechanics once it was served with a wage withholding order. Since the filing of the amended plan, debtor has not come close to making the full $3,493 monthly payment. On August 18, debtor paid $500 by money order; on September 10, debtor paid $650 by money order (A check for $800 was also sent on September 10 but returned NSF); on September 16, debtor paid another $600 by money order; and on September 23, debtor paid $1,400 by personal check, for a total of $3,150 since the amended plan was filed.

In addition to not making the full plan payments, the trustee indicates that debtors are not current on their post-petition mortgage payments. Under the original plan, these payments were to be paid direct to National City, but that did not occur and a post-petition arrearage now exists of some $5,000. Debtor's employer Roof Mechanics has not withheld income taxes from his pay and debtor has not remitted any quarterly tax payments.

Moreover, it does not appear that Dipman will be current on the amended plan at the outset due to disputed claims over the $4,700 collected on the Brittany receivable and the growing post-petition arrearage on the mortgage. The Dipmans have not suggested how they intend to bring the plan current and address the considerable default over the first five months of the original plan.

The Court cannot conclude that debtors are able to make all plan payments and comply with the plan. As shown to date, debtors have been unable to make even a $1,551 monthly payment, let alone a $3,493 monthly payment. Debtor's employment with Roof Mechanics has to date not provided a stable, regular source of income for debtor and his employment is simply too uncertain from which to conclude that a $3,493 monthly payment for 54 months could be funded. While the addition of Mrs. Dipman's income might elevate this case to a closer determination on feasibility, she is unwilling to submit her income to an employer pay order. Accordingly, as proposed by debtors, the plan is not feasible and unconfirmable.

### *Lack of Good Faith*

The trustee and objecting creditors assert that debtors' amended plan is not proposed in good faith as required by §1325(a)(3). The Court applies the nonexhaustive *Flygare* factors to the

evidence presented at trial.[12] Those considerations include:

    (1) the amount of the proposed payments and the amount of the debtor's surplus;
    (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
    (3) the probable or expected duration of the plan;
    (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
    (5) the extent of preferential treatment between classes of creditors;
    (6) the extent to which secured claims are modified;
    (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
    (8) the existence of special circumstances such as inordinate medical expenses;
    (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
    (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
    (11) the burden which the plan's administration would place upon the trustee.[13]

Application of these factors to the facts here causes the Court several concerns. The stability of debtor's roofing employment is uncertain. While debtor announces that he has resumed employment with Roof Mechanics effective as of October and going forward, the Court has no indication how Roof Mechanics will react when an employer pay order is again directed to it. Will Roof Mechanics again terminate debtor's employment or resort to paying debtor in cash as it has allegedly done previously? No representative of Roof Mechanics testified at the confirmation hearing to reassure the Court regarding debtor's employment status and compensation. It is unclear whether debtor is on a weekly salary with Roof Mechanics as he testified, or whether debtor is paid on a commission basis as the one paystub admitted into evidence suggests. Debtor's brief employment history with Roof Mechanics gives no indication that he will earn a sufficient income to make a $3,493 monthly plan payment. Apart from the Roof Mechanics job, debtor's employment

---

[12] *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir. 1983) (adopting the factors from the Eighth Circuit's *United States v. Estus, (In re Estus),* 695 F. 2d 311 (8th Cir. 1982)).

[13] *Id.* at 1347-48.

-10-

prospects are unknown. Debtor's ability to return to self-employment in the roofing business is highly questionable given the negative publicity he has received concerned his business practices and licensing issues with the cities of Wichita and Derby.

The debtors' motivation and sincerity in seeking chapter 13 relief is also suspect. For a period of 8 years, Mrs. Dipman has enjoyed stable, secure employment and income with IMA. But her unwillingness to subject any of her pay to an employer pay order substantially reduces the prospects for successful completion of their plan. Not all of debtors' debts are attributable to Mr. Dipman's roofing enterprises. Debtors jointly owe a sizeable mortgage obligation. And the debt incurred to purchase the 2003 Hummer six-months before filing bankruptcy is that of Mrs. Dipman.

Debtors, in August of 2004, filed a chapter 7 bankruptcy and received a discharge on February 3, 2005.[14] Debtor testified that the prior chapter 7 was precipitated by medical bills. As in the current case, debtors scheduled unsecured priority tax claims (income tax) in their previous chapter 7. In the 2004 filing, Mr. Dipman listed his first employment stint with Roof Mechanics as a roofer (2 ½ years) drawing a *monthly* gross income of $1,848. On his Statement of Financial Affairs, he listed his 2002 income at $27,490 and his 2003 income at $20,727. It is apparent to this Court that Mr. Dipman has not previously earned any amount close to $52,000 a year ($1,000/week) as a roofing employee.[15]

The most troubling aspect of debtors' lack of good faith, however, is Mr. Dipman's post-petition conduct. He continued the "shell game" in the operation of his roofing business. He

---

[14] Case No. 04-14654.

[15] Mr. Dipman testified that he earned $85,000 in the last year of his Roof Mechanics employment as a salesman (2005), but no supporting documentation of his testimony was provided.

-11-

established new bank accounts at Intrust Bank in the name of Derby Roofing and added a third name, Tri Cities Roofing, to his arsenal of roofing companies under which he did business. He continued post-petition his pre-petition pattern of obtaining substantial material deposits from roof customers and failed to perform the roof work.[16] These customer claims total some $27,000 and debtors have established a special class in their plan to pay these claims pro rata with secured claims. In short, by incurring these post-petition debts, debtors have diverted plan payments that would have otherwise gone toward payment of general unsecured creditors. The Court declines to shelter this sort of behavior under the bankruptcy umbrella, particularly when there appears no likelihood of the plan's success.

Conclusion

Debtors' plan is neither feasible nor filed in good faith. Confirmation is therefore DENIED and the case is DISMISSED.[17]

The Court need not reach the issue of to whom the disputed Brittany receivable funds belong. The trustee is directed to pay the same over to the Clerk of the District Court of Sedgwick County on account of the ABC judgment and the parties may contend over it in that forum. Finally, because the Court cannot determine who owns the funds, it cannot order that Arst &Arst's fees be paid from them.

# # #

---

[16] *See* ABC Ex. 9 and 10.

[17] Because debtors received a discharge in a prior chapter 7 case filed in 2004, this case cannot be converted due to debtors' ineligibility for another discharge. *See* 11 U.S.C. § 727(a)(8).

-12-